IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| River City Capital L.P. : | |
| : | Case No. C-1-03-289 |
| Plaintiff : | |
| : | District Judge Susan J. Dlott |
| v. : | |
| : | DECISION AND ORDER |
| Board of County Commissioners, *et al.* : | |
| : | |
| Defendants : | |

This matter comes before the Court pursuant to a bench trial held on August 3 and 4, 2005. After considering the evidence and arguments advanced by the parties, the Court finds for the Defendant based on the following findings of fact and conclusions of law.

**A.     PROCEDURAL BACKGROUND**

On April 22, 2003, Plaintiff River City Capital LLP ("River City") filed its complaint against the Board of County Commissioners of Clermont County, Ohio and three individual commissioners sued in their official capacities (collectively, "Clermont County"). This case arose from the July 17, 2001 collapse of a portion of a 72 inch storm water sewer pipe running the length of an easement on a property owned by River City. River City states the following causes of action: (1) taking of property without just compensation in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution; (2) denial of due process in violation of the Fourteenth Amendment to the U.S. Constitution; (3) nuisance; and (4) claim for writ of

1

mandamus.[1]

This Court previously denied Defendants' Motion to Exclude Testimony of Plaintiff's Expert Witness Robert W. Trenkamp, P.E., P.S. or in the Alternative to Dismiss for Lack of Jurisdiction (doc. #19). Defendants argued that Plaintiffs failed to exhaust the state remedies for a taking. This Court held that, because Plaintiffs appeared to state a case for a physical taking, not a regulatory taking, Plaintiffs were not required under Ohio law to file a petition for mandamus, and thus that the Court did have subject matter jurisdiction.[2] (See doc. # 30.)

The parties filed a Joint Final Pretrial Order (doc. # 42), and each party submitted proposed findings of fact and conclusions of law (see docs. # 38, 39). Before trial, the parties submitted Stipulations of Fact (doc. # 45). The parties have also submitted post trial briefs on a number of issues the Court asked them to address at the beginning of the hearing (docs. # 49, 50, 51).[3]

River City requests that the Court: 1) find that Clermont County has taken its easement, and the 72 inch storm water pipe running the length of that easement, for public use; 2) order

---

[1] River City clarified at the bench trial that it was not seeking a writ to compel appropriation proceedings, but rather a writ ordering Clermont County to take responsibility for the 72 inch storm water pipe and all future maintenance of the pipe.

[2] This Court also held that while Plaintiff was late in filing a compliant expert report, there was no harm to Defendants, and the expert's testimony need not be excluded. The Court did award Clermont County its attorneys' fees and costs for pursuing the motion to exclude testimony. (See doc. # 30, p. 6 and doc. # 41.)

[3] At the close of River City's case, Clermont County made an oral motion to dismiss River City's case, arguing that 1) River City presented no evidence supporting its physical taking claim; and/or 2) River City's case was more properly stated as a regulatory taking case, not a physical taking case, and as such, this Court does not have jurisdiction over the case. The Court took Clermont County's motion under submission. Having found for Defendant on the merits, the Court declines to consider Clermont County's motion.

that Clermont County assume full responsibility for the storm water pipe in the easement and direct River City to officially convey the easement to Clermont County; and 3) order Clermont County to pay River City damages in the amount of $330,000.00 for the repair and replacement of the pipe as a public improvement previously directed by Clermont County.

**B.  FINDINGS OF FACT**

River City is an Ohio limited partnership that owns property in Clermont County, Ohio. (Doc. # 45, ¶ 1.)  Clermont County is a political subdivision of the state of Ohio.  (See id. at ¶ 2.) River City owns real estate located at 770 Eastgate South Drive, Union Township, Clermont County, Ohio (and described more particularly in a warranty deed (see JX I)) (the "River City property").  (See id. at ¶ 3.)

**Chain of Title and Location of the Property and Its Neighboring Parcels**

The River City property lies between two parcels, one containing an Oak Express and the other a McDonald's.  The properties are bordered on the north side by Route 32 and on the south side by Eastgate South Drive.  At one time, Eastgate Square Associates owned all three parcels. On September 5, 1984, Eastgate Square Associates conveyed to McDonald's Corporation the real property located at 876 Eastgate South Drive ("McDonald's Property").  On October 24, 1984, Eastgate Square Associates conveyed what is now the River City property to Anthony J. Nickert, Trustee.  (See id. at ¶ 5.)  The River City property lies to the east of the McDonald's property.  On April 4, 1985, Eastgate Square Associates conveyed the real property located at 760 Eastgate South Drive to Granville Foods, Inc., and on April 5, 1990, Granville Foods, Inc. conveyed that parcel to Visser Real Estate Investments ("Visser").  That parcel now houses Oak Express.  The River City property is immediately to the west of the Oak Express property.

On December 17, 1991, Anthony Nickert, Trustee, conveyed the River City property to Anthony J. Nickert, a married man. (See id. at ¶ 7.) On November 23, 1992, Anthony J. Nickert, a married man, conveyed the River City property to River City.[4] (See id. at ¶ 8.) River City leases the property to the Twins Group pursuant to a lease between Anthony J. Nickert, Trustee and Pizza Huts of Cincinnati, Inc. (See DX 11.) The lease provides that the lessee shall maintain, repair, and/or replace, among other things, "all plumbing ... the parking, landscaping, and fixtures and improvements thereof" at its own expense. (See id., clause IX.)

**History of the Existing Easements and Storm Water System**

The River City property is burdened by a Reciprocal Easement Agreement ("Agreement") dated August 20, 1984, between Eastgate Square Associates, both River City's and Vissers' predecessor in interest, and McDonald's Corporation. (See JX I, PX E.) The Agreement provides that McDonald's grants Eastgate Square Associates "a perpetual, non-exclusive easement . . . for the purposes of installing, operating, maintaining, repairing, replacing and renewing a storm sewer line and related facilities over, above, along, under, in and across" the McDonald's property, and that Eastgate Square Associates grants McDonald's an easement of the same kind on Parcel 3. (See PX E.) Pursuant to the Agreement, McDonald's agreed to maintain the portion of the storm sewer line running across part of its property to the hookup, and Eastgate agreed to maintain the rest of the storm sewer system. (Id.) The Agreement provides that all of its provisions run with the land and are binding upon the successors of the parties. (Id.)

---

[4]As of November 23, 1992, Anthony J. Nickert was a limited partner in River City; he became the general partner in 1983. (See id. at ¶ 9.)

4

The survey records of the Clermont County Engineer show a 15 foot wide storm sewer easement running along the west property line of the River City property, which borders the Oak Express property. (See DX 16a.) There is also a 72 inch storm water pipe in the easement running down the property line between the River City property and the Oak Express Property ("subject pipe"). The subject pipe is buried 30 feet below ground. It is connected to a vault, which is a square concrete room. There is a 36 inch storm water pipe running across the McDonald's property and another 72 inch pipe running across the Oak Express property that both also connect to the vault. The water from both of those pipes then flows into the subject pipe.

The vault, the subject pipe, and the 72 inch pipe on the Oak Express Property and the 36 inch pipe on the McDonald's property (the "subject system"), were all in place before October 24, 1984, when Anthony J. Nickert, Trustee, a predecessor in interest to River City, took title to the property. Nickert knew that the pipes for storm water were on the property, but did not know of the storm water easements. Nickert did not handle the purchase of the property himself, however, but left it up to his stepson and his lawyers to review the documents regarding the property.

The subject pipe, as well as the other 72 inch pipe and the 36 inch pipe, are all connected to a storm water management system that drains a 280 acre watershed ("watershed"). The subject pipe connects to another pipe that crosses under Route 32, which is the northern boundary of the watershed, and empties into a lake. This storm water management system includes a retention basin, which is located on a Bigg's lot to the south of the property across Eastgate South Drive. The retention basin acts as a funnel, holding the water runoff from the

upstream areas of the watershed, and gradually letting the water filter out through a 60 inch pipe that connects to the 72 inch pipe on the Oak Express Property.  Before the subject pipe was installed, the retention pond on the Bigg's lot drained onto the surface of the River City property.  Now, any storm water that collects on Eastgate South Drive drains either to the 72 inch pipe on the Oak Express property, or the retention basin, and ultimately through the subject pipe, and then through the pipe that runs beneath Route 32.

In 1995, Clermont County and Jackson Center Associates Limited Partnership (Jackson Center) entered into a Right of Way Dedication Plat ("Dedication") for Eastgate South Drive and Eastgate Square Drive.  (DX 15.)  Via the Dedication, Jackson Center consented to the dedication of Eastgate South and Eastgate Square Drives to the public use, and Clermont County accepted those streets as public roads.  (See id.)  River City was not a party to the Dedication. (See id.)  The Dedication provides specifically that:

> Clermont County Commissioners assumes no legal
> obligation to maintain or repair any open drainage ditches
> or channels designated as 'drainage easements' on this plat.
> The easement area of each lot and all improvements with it
> shall be maintained continuously by the lot owner.  Within
> the easements, no structure, planting, fencing, culvert or
> other material shall be placed or permitted to remain which
> may obstruct, retard or divert the flow through the water
> course.

(See id.)  Patrick Manger, the Clermont County Engineer, testified that the former language is mandatory to show that Clermont County's responsibility is limited to those areas within the public right of way.  The Dedication did not effect the way the storm water system functioned; both before and after the Dedication, water from the streets drained into the system.

**The Collapse and Repair of the Subject Pipe**

6

On July 17, 2001, Gayle Jacobs, River City's property manager, received word from someone at the Twins Group that there was a sinkhole developing on the River City property. She attended a meeting a couple of weeks later with Carl Hartman, the Clermont County engineer, Oak Express' construction manager, someone from a company called S.W.S., a representative of the Twins Group, and an architect associated with the Twins Group. All parties discussed the sinkhole, which was already 18 feet in diameter. At the meeting, Hartman said that Clermont County was not responsible for the repairs. He explained that the night before the sinkhole was discovered, there had a been a five-year rain, and as a result, Clermont County was in a flood emergency. At the meeting, Oak Express and the Twins Group agreed to hire and pay S.W.S. to investigate the storm sewer. Later, however, Jacobs spoke with someone at the Twins Group about paying for the necessary repairs and the Twins Group refused to take responsibility for the repairs.

Jacobs and River City's attorney received calls from other property owners in the area about the flooding and the repairs. On November 12, 2001, Jacobs retained Nixco Plumbing ("Nixco") to repair the damage. Jacobs testified that River City did so because 1) the sinkhole was enlarging so rapidly that the building on the property was in danger; and 2) Clermont County ordered River City to make the repairs. Jacobs testified that this order was contained in a November 2, 2001 letter to the Twins Group from the Clermont County Prosecuting Attorney's office. That letter stated that the sinkhole and collapsed pipes were causing the flooding of Eastgate Drive, turning a private matter into one of public concern. (See PX V-6.) The letter further stated that Clermont County searched its records and found no dedication to public use pertaining to the storm sewer easements on the McDonald's property, the River City property, or

7

the Oak Express property, and that Clermont County thus had no legal obligation to maintain or repair the easement. (Id.) The letter concluded by "insist[ing]" that the Twins Group "take immediate action" to repair "the existing storm sewer system." On cross-examination, however, Jacobs said her interpretation of that letter, which she received via fax from the Twins Group, is that Clermont County was ordering the Twins Group to make the repairs. The Court agrees. The letter is not addressed to River City, does not mention River City, and contains no order for River City to make repairs.

Guy Hickman of Nixco drafted Nixco's proposal for the necessary repairs and costs. Hickman did not visit the site until October and was not on the site on a daily basis; Mike Kuhl supervised the repairs. The crater resulting from the sinkhole was on the property line between the River City property and the Oak Express property. Between the first time Kuhl went to the site to see the damage and when Kuhl went back to do the work, the crater had doubled in size. The subject pipe was being crushed underneath the weight of the collapsing ground above it, and the pipe was backed up. The damage caused the vault to shift. The weight of the vault then crushed and destroyed a portion of the 72 inch pipe coming from Oak Express. Kuhl testified that in addition to that 72 inch pipe, Nixco had to repair Oak Express' gas line and sanitary sewer line in order to repair the subject pipe and the parking lot.

Kuhl testified that the subject pipe collapsed due to a combination of factors, including that the pipe was not properly constructed or reinforced, and that saltwater runoff (from de-icing the surfaces that drained into the pipe) corroded the bottom of the pipe. Though some pieces of the pipe system had to be replaced, Nixco made no changes to the design of the pipe system or the materials. Nixco repaired the subject pipe, which was made of corrugated metal, with

corrugated metal. Hickman testified that the pipe will continue to function without problem following the repairs.

Nixco also resurfaced the parking lot. River City hired Foppe Technical Group ("Foppe") to insure that the new soil was installed properly, and Signet Services ("Signet") to replace a power line, parking lot light, and parking lot light pole and base that were damaged by the collapse of the pipes. River City paid Nixco a total of $261,066 for the work they performed (PX P). River City paid Foppe Technical $9,313.99 (PX O). River City paid Signet Services, Inc. $1572.00. (PX Q). Neither Nickert nor anyone at River City gave permission for Clermont County to drain water from the streets through its pipes.

**Expert Testimony**

Robert W. Trenkamp, P.E., P.S., testified as an expert witness for River City. Richard K. Evans, P.E., L.L.P., testified as an expert witness for Clermont County. The experts agree on the proposition that when land is changed from pervious to impervious land, as would happen when undeveloped land is paved for development, there is an increase in both the velocity and the volume of the water runoff.

**Clermont County's Development Regulations**

Trenkamp opined that Clermont County required the private developers who built within the watershed to provide private storm water systems from 1984 to 2001. Trenkamp testified that from 1985 to 1990, to construct commercial development in Eastgate, a developer had to get a building permit from Clermont County and needed the proper zoning. Trenkamp also testified that in 1990, Clermont County adopted regulations for storm water management requiring any new development to include provisions for storm water management. (See JX XII.) Trenkamp

testified, however, that he did not know the specific nature of Clermont County's requirements or regulations regarding storm water management from 1983 to 1990.[5] Trenkamp's opinion about Clermont County's requirements is unsubstantiated because he did not have sufficient information to support his conclusion.[6]

Evans testified that he did not know of any Clermont County storm water management requirements for private commercial developments that were in place before Clermont County adopted the 1990 regulations. Evans reviewed the 1983 Storm Water Management Report for Eastgate South, which was prepared by Center Ridge Design Services, Inc., and appears to be a private report. (See DX 2.) Evans testified that the subject system is in fact the storm water management system that was conceptualized in that report.

Evans explained that the subject system was added into the existing pipe system by removing portions of the end of existing pipes[7] and connecting the new 72 inch and 36 inch pipes to the existing pipes. The River City property is the low point of the watershed, so before the subject system was installed, all of the water from the watershed accumulated on the surface of the land that became the River City property. Evans opined that the subject system, including the subject pipe, were installed to make it possible to develop what is now the River City property, the McDonald's property, and the Oak Express property.

---

[5] Trenkamp also failed to review all of the easements agreements relating to all of the property in the watershed.

[6] Trenkamp also opined that pursuant to the Dedication Clermont County accepted the easement on the River City property as a public easement. The question of the legal effect of the Dedication is a legal question on which Trenkamp is not qualified to opine as an expert.

[7] Portions of pipe were removed from the pre-existing 60 inch pipe that now connects to the 72 inch pipe on the Oak Express property, and pre-existing 54 inch pipe that now connects to the 36 inch pipe.

**C.      ANALYSIS**

      **1.      Jurisdiction and Legal Standard**

The Court has jurisdiction over River City's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over River City's state law claims under 28 U.S.C. § 1367.  River City brought its Fifth and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983, which provides recovery for constitutional deprivations made under the color of state law.  See Prater v. City of Burnside, KY, 289 F. 3d 417, 424 (6th Cir. 2002), cert denied, 537 U.S. 1018 (2002).

      **2.      5th Amendment Takings Claim**

In Count I, River City brings a claim pursuant to the Takings Clause of the Fifth Amendment of the United States Constitution.  The Takings Clause of the Fifth Amendment provides that the government may not take private property for public use without just compensation.  See U.S. Const. amend. V.  That provision is made applicable to the states through the Fourteenth Amendment.  See Prater, 289 F. 3d at 424.  The Ohio constitution also includes a takings clause, see Article I, Section 19, and the Ohio Supreme Court has defined "taking" in accord with the United State Supreme Court's interpretation of that word.  See State, ex rel. Pitz v. Columbus, 56 Ohio App. 3d 37, 41, 564 N.E. 2d 1081, 1086 (Ohio Ct. App. 1988).  To prove its takings claim, River City must show that Clermont County:  1) took its property; and 2) failed to provide just compensation.  See Prater, 289 F.3d at 425.  River City advances three theories in support of its claim that Clermont County has caused a physical taking of the subject pipe and the easement on its property without providing just compensation.  River City argues that the taking occurred gradually over time until the complete taking in 2001 when the subject pipe collapsed.  The Court holds that River City has not proved the necessary elements of

its takings claim under any of its theories.

### a. Alleged Taking By Permitting Development

First, River City alleges that Clermont County caused a taking by permitting commercial development on adjacent land and requiring the owners of that land to provide private storm water drainage, and further by requiring the owners to do so by diverting storm water into River City's private storm sewer. River City cites Caponi v. Carlson, 392 N.W. 2d 591 (Mn. Ct. App. 1986) as persuasive authority in support of its argument. Caponi, however, does not support River City's argument and is distinguishable from the case at hand.

In Caponi, the Minnesota Appellate Court considered a landowner's appeal from the trial court's decision holding that the City had not taken his land. 392 N.W. 2d at 592. The landowner owned land which he used to graze cattle. Id. The land had a pond on it. Id. In 1972, the City issued a report that designated a portion of the landowner's land as a storm water retention pond. Id. at 593. The City then adopted that report, which included a storm water management plan. Id. A neighboring property owner also began developing his land for single family homes. Id. As part of the plat approval structure, the City required the neighboring owner to follow its storm water management plan. Id. The City also constructed two storm water pipes and connected them to the retention pond on the landowner's property. Id. at 595. All of these actions caused a substantial increase in the water in the pond and permanently flooded the landowner's property. Id. at 596. Finally, the City petitioned the Department of Natural Resources to approve its plan to keep a nearby lake at a higher water level, which necessitated keeping the landowner's pond as the retention pond for the system. Id. at 595.

The landowner argued, among other things, that the City's ratification of his neighbor's

12

blocking a drainage ditch amounted to a taking. Id. at 594-95. The Caproni court did not make its finding on that basis, however. In finding that the City had taken the landowner's land, the Court specifically noted that the City "did more than merely adopt plans and recognize the existence of a pond," citing the City's construction of the two storm water pipes and its efforts to ensure that the pond would continue to serve as a storm water retention pond. Id. The court noted that it had "always found a taking in flooding cases involving the permanent physical occupation of another's land." Id. The court also noted that all of the City's regulations of the landowner's property would not amount to a taking unless it deprived the property of all reasonable use. Id. In Caproni, the court found that due to the City's direct actions, the landowner no longer had any use of his land. Id. at 596.

Thus, the court's finding in Caproni was explicitly based upon the city's physical appropriation of the landowner's land. See id. Contrary to River City's assertion, the case does not stand for the proposition that a city effects a taking of land by permitting neighboring private property owners to develop their land, which somehow negatively impacts the subject land. River City has provided no other authority supporting that proposition. The Court thus finds that River city has not stated a claim for a taking under this theory.

Regardless, even if River City stated a claim for a taking, River City presented insufficient evidence in support of its claim. While it appears that Clermont County has maintained some storm water management requirements for private property owners over the years, there is no evidence that Clermont County required the other property owners within the watershed to construct systems that discharge onto River City's subject pipe or easement. The evidence showed, to the contrary, that River City's pipes were added into an existing storm

water system in order to make the River City property fit for development. There is also no evidence that Clermont County's regulations, whatever they might have been, caused the flooding or collapse of River City's storm sewer, or caused the complete devaluation of the land. The evidence supports only one conclusion: that the stormwater management system in the watershed is a private system, created by private developers for the benefit of their own parcels. River City has thus failed to prove that Clermont County physically invaded or appropriated its property and consequently has failed to prove a taking.

### b. Alleged Taking By Runoff from Clermont County's Streets

Second, River City alleges that in 1995, Clermont County accepted a dedication of certain private streets located in Eastgate Square pursuant to the 1995 Right of Way Dedication Plat for Eastgate South Drive and Eastgate Square Drive ("Dedication"). River City argues that as such, Clermont County became the owner of and had responsibility for the maintenance of those streets. River City contends that Clermont County allowed the storm water runoff from its streets to discharge into River City's storm sewer, which caused its collapse, and that amounts to a taking.[8]

Again, this argument is closely analogous to that in taking-by-flooding cases, as River City has suggested, in effect, that Clermont County destroyed the subject pipe and easement by flooding it until it collapsed. To establish a takings claim under the Fifth Amendment for a government's flooding of private property, a plaintiff must prove that the government has

---

[8] It should be noted that River City did not make any of these allegations in its complaint. Such allegations were incorporated into the parties' Joint Final Pretrial Order (doc. #42), however, and Clermont County responded to the allegations in its Proposed Findings of Fact and Conclusions of Law (doc. # 38).

"effectually destroyed the land . . . or that the government has subjected the land to permanent liability to intermittent but inevitably recurring overflows." See Cox v. Tennessee Valley Auth., No. 92-5641, 1993 WL 72488, at **3 (6th Cir. Mar. 15, 1993) (internal quotations and citations omitted). Such inevitably recurring flooding must be directly attributable to the government's actions. Id. A temporary invasion is insufficient to constitute a taking; there is only a taking where it is shown that the flooding constitutes "an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property." Id. at **4.

The most analogous case the Court could find to the case at hand is City of Van Buren, Arkansas v. U.S., 697 F.2d 1058 (Fed. Cir. 1983). In City of Van Buren, the Federal Circuit affirmed the judgment of the United States Claims Court, which held that the city suffered a compensable taking under the Fifth Amendment when the Government appropriated a subterranean flowage easement and thereby caused damage to the city's sewer system. Id. at 1058-59.

In City of Van Buren, the city owned a subterranean flowage easement, in which it maintained a sewer system. Id. at 1059. At the time the sewer system was constructed, the groundwater was below 380 feet mean sea level, and the sewer system was, at its lowest point, at 384.25 feet mean sea level. Id. A few years later, the U.S. Army Corps of Engineers closed a dam on the Arkansas River as part of a project to improve flood and erosion control, among other things. Id. After closing the dam, the water level rose gradually, eventually reaching 389 feet mean sea level, and causing three failures in the sewer system as it rose. Id. After the third failure, the city changed its policy from repairing the failing sewer lines to replacing the lines, at a cost of $200,000. Id. The groundwater continued to rise and fluctuate between 390 and 395 feet

mean sea level, causing at least four more failures of the sewer lines. Id. at 1059-60.

The trial judge held that by raising the groundwater level, the Government made it impractical for plaintiff to use its sewer system as designed and more expensive to repair any failures in the system. Id. at 1060. The trial judge concluded that a taking occurred at the time of the third failure. Id. at 1059. The Federal Circuit upheld the trial judge's conclusion based on ample evidence that the Government's closing the dam "significantly increased the cost of repairing failure and rendered impractical" use of the materials from which the sewer system was constructed" – that is, effectually destroyed it.

In this case, unlike in City of Van Buren, there is no evidence that Clermont County took some action that directly caused an increase of water flowing into the subject pipe. Moreover, there is no evidence that water runoff from Clermont County's streets caused the collapse, nor any evidence to support the more general claim that an increase of water flowing into the subject pipe caused the collapse. The evidence showed that the subject pipe collapsed due to a combination of factors, including that the pipe was not properly constructed or reinforced, and that saltwater runoff corroded the bottom of the pipe. In addition, Hickman, who supervised the repair of the pipe, testified that the pipe will continue to function without problem following the repairs. There is thus no evidence that the collapse of the pipe will recur, and no evidence that the easement has been effectually destroyed. River City has thus failed to prove that Clermont County physically invaded or appropriated its property and consequently has failed to prove a taking.

        **c.**    **Clermont County Allegedly Accepted Easement as a Public Easement**

Finally, River City seems to argue in the alternative that it no longer owns the easement

because Clermont County took the easement as a public easement pursuant to the Dedication, and Clermont County thus owes River City for the $300,000 in repairs that Clermont County ordered it to make.[9] River City is incorrect. Clermont County could not take River City's easement or pipe pursuant to the Dedication because the Dedication did not involve the River City property. River City was not a party to the Dedication. River City has thus failed to prove that Clermont County physically invaded or appropriated its property and consequently has failed to prove a taking. Regardless, even if Clermont County had taken the easement via the Dedication, which it did not, then the taking happened in 1995. Section 1983 actions arising from alleged unconstitutional conduct in Ohio face a two year statute of limitations. See Banks v. City of Whitehall, 344 F. 3d 550, 553 (6th Cir. 2003). This action, which was filed in 2003, is thus far out of time under this theory of the taking.

### 3. 14th Amendment Due Process Violation

In Count II, River City makes a claim under 42 U.S.C. § 1983 for violation of its due process rights under the Fourteenth Amendment. Clermont County argues that River City's due process claim should be dismissed because it is subsumed by River City's takings claim. Clermont County is correct. See Montgomery v. Carter City., Tenn., 226 F. 3d 758, 769 (6th Cir. 2000). A substantive due process claim has no place where another provision of the Constitution directly addresses the type of illegal conduct the plaintiff alleges. See id. Thus, River City's due process claim is subsumed by its takings claim, and the Court enters judgment for Clermont

---

[9] River City did not make this argument in its complaint, either.

17

County on that claim.[10]

    **4.    Nuisance**

In Count III, River City makes a claim for nuisance. River City alleges that Clermont County "has created conditions that caused increased stormwater to discharge into the private stormwater sewer and on the Property, impaired the existing system on the Property, created an erosion hazard on the Property and impaired the private stormwater sewer on the Property." River City presented no argument on the issue of nuisance at the hearing, however.

Nuisance is best stated in this context as a "civil wrong, consisting of anything wrongfully done or permitted which interferes with or annoys another in the enjoyment of his legal rights." See Taylor v. Cincinnati, 143 Ohio St. 426, 436, 55 N.E. 2d 724, 729 (Ohio 1944). In resolving disputes regarding surface water, Ohio courts apply a reasonable-use rule. See McGlashan v. Spade Rockledge Terrace Condo, 62 Ohio St. 2d 55, 60, 402 N. E. 2d 1196, 1200 (Ohio 1980). Under the reasonable-use rule, a landowner may not deal with surface water however he pleases, but is not prohibited from interfering with the natural flow of surface waters to others' detriment. Id. Each landowner may make reasonable use of his land, "even though the flow of surface waters is altered thereby and causes some harm to others, and the possessor incurs liability only when his harmful interference with the flow of surface water is unreasonable." See Bays v. Kent State Univ., 86 Ohio Misc. 2d 69, 74, 684 N.E. 2d 1328, 1331-32 (Ohio Ct. Cl. 1997) (citing

---

[10] Clermont argues in the alternative that River City's due process claim should be dismissed because: "River City has not produced any evidence that Clermont County required other property owners to discharge surface water onto Plaintiff's property, or that Clermont County created 'conditions' (unspecified) to increase storm water discharge. In fact, Plaintiff River City cannot demonstrate any increase in storm water discharge whatsoever.'" (See doc. # 28, p. 11.) The Court need not consider this argument since judgment must be entered for Clermont County on other grounds.

McGlashan).

River City presented no evidence suggesting that the City made an unreasonable use of its land, the public streets. The evidence showed, to the contrary, that the improvements that the City made to the public streets had a negligable effect on the water flow within the watershed. Moreover, there is no evidence that the water flow from Clermont County's streets caused the sinkhole or the collapse of the subject pipe. Thus, River City has not proved the elements of a nuisance claim and the Court enters judgment for Clermont County on that claim.

    5.    **Writ of Mandamus**

In Count IV, River City requests a writ of mandamus ordering Clermont County to take responsibility for the subject pipe and all future maintenance of the pipe. A writ of mandamus is an order to a public officer or entity to perform an act which is that officer's or entity's duty under the law. See Ohio Rev. Code § 2731.01. In order to prevail on a request for a writ of mandamus, River city must prove that it "is entitled to the performance of a clear legal duty and that [it] has no adequate remedy at law." See Kruse v. Village of Chagrin Falls, Ohio, 74 F.3d 694, 699 (6th Cir. 1996) (citing State ex rel. Citizens for Responsible Taxation v. Scioto County Bd. of Elections, 67 Ohio St. 3d 134, 616 N.E. 2d 869, 871 (Ohio 1993)). River City has not proved a taking of its property nor any other reason that it is entitled to have Clermont County take responsibility for the subject pipe. The Court therefore denies River City's request for a writ of mandamus and enters judgment for Clermont County on that claim.

**D.** **CONCLUSION**

For the foregoing reasons, the Court enters judgment in favor of Defendant Clermont County on all of River City's claims.

IT IS SO ORDERED.

                                                ___s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge